# GRIFFITH v. GODEY & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF CALIFORNIA.

Argued December 15, 1884.—Decided January 12, 1885.

A probate settlement of an administrator's account does not conclude as to property fraudulently withheld from it.

In 1870, aliens, residents in California, had the same rights as citizens, to hold and enjoy real estate.

A trustee receiving money from the sale of real estate is bound to account for it, without regard to the quality of title conveyed by him.

The facts of this case disclose a case of deception and fraud, practised upon a person of weak intellect, and a conspiracy to obtain his property for a consideration so grossly inadequate, as to warrant the intervention of a court of equity.

This was a suit in equity to charge the defendants as trustees of certain property in which the complainant was interested, and which they received and disposed of. The facts out of which the case arose, briefly stated, were as follows: For some years previous to 1870 the complainant Ellis Griffith and his brother John Griffith were partners, engaged in the business of cattle raising, and resided in Kern County, California, where they occupied what is called a stock range—a tract of country on which cattle are permitted to roam and graze. It may be termed a feeding ground—the pasture land of the cattle. Although the title to the land constituting the range was in the United States, and the land was not inclosed, the right of the Griffiths to use it for the pasturage of their cattle was recognized and respected by their neighbors and other stock raisers in the county. It had excellent springs, furnishing water to cattle roaming over a large extent of country, and was capable of supporting from one to three thousand head. It had, therefore, a great value, proportionate to the number it could support. In April, 1870, one Pedro Altube, a member of the firm of Peres & Co., large cattle dealers in California, who was familiar with Kern County and with the

character of the range, desired to purchase it for his firm, and offered for it, with the stock, $12,000.

John Griffith died on May 21, 1870, intestate, leaving surviving him two brothers, the complainant and Morris Griffith, his only heirs at law. The partnership property of the deceased and the complainant remained in the latter's possession. It consisted, principally, of horned cattle, horses and the range 'mentioned. The brother Morris, who would have been a proper party complainant, declined to take part in the suit. Ellis Griffith, the surviving partner, was a man of weak mind, without any knowledge of business, and barely able to read and write. Among his neighbors were the defendants Godey and Williams. Godey was an old resident of the county, a man of means, and had the entire confidence of the complainant. On the 9th of June, within a month after the death of the intestate, Altube spoke to Godey about purchasing the range, and stated that he would give for it, with the stock, $12,000—the sum he had offered previously in April—but Godey then had no control over the range and could therefore give no title to it. The complainant and the deceased were aliens, and on the 15th of July, 1870, upon the advice of Godey, the complainant declared his intention to become a citizen of the United States, and soon afterwards, upon similar advice, filed an affidavit in the office of the clerk of the county, to the effect that he had taken up one hundred and sixty acres of the range where the springs were. This proceeding was had under a statute of California passed in 1852, which gave the claimant a standing in the courts of the State, and enabled him to maintain possession as against any one not having the title of the United States. The bill alleges that the complainant did not know the nature of the affidavit he had filed, but supposed that by the statement he had made in court he had become a citizen. On the day following, July 16, Godey filed in the Probate Court of the county a petition for special letters of administration on the estate of the deceased, and on the 19th of July he was appointed special administrator. The complainant, as surviving partner, was entitled to wind up the affairs of the partnership; but he consented that

Godey should receive full letters of administration, and, as administrator, settle the estate of the deceased, without prejudice, however, to his rights as surviving partner to an undivided half of the proceeds of the estate after the payment of its debts and the expenses of administration. Godey thereupon resigned as special administrator, and was appointed full administrator. He seems to have considered the consent of the complainant as authorizing him to settle up the partnership business as administrator, and accordingly he at once took possession of all its personal property. In August following he filed his inventory, accompanied with his affidavit that it was a statement of "all the estate of the deceased" which had come to his knowledge and possession. He did not include in it the range or any land. The property mentioned was valued by appraisers appointed by the court at $3,283.50, and consisted of one hundred and forty-two horses valued at nine dollars each, one hundred and twenty-seven cattle valued at fifteen dollars each, a wagon and harness valued at one hundred dollars, and a branding-iron valued at fifty cents. On the 16th of that month, upon representations of Godey, an order was obtained from the court, that the horses and cattle be sold, as perishable property, and, on the 27th of the same month, they were accordingly sold, together with thirty-one horses not mentioned in the inventory, but subsequently found to belong to the partnership, and a few articles of little value also omitted from the inventory, all of which were bid off by the defendant Williams for $2,077.50. No portion of this sum was paid by Williams at the time. Three weeks afterwards he paid $600 on account; the balance was not paid until after the sale to Altube, as hereinafter mentioned. The sale was, however, reported by Godey under oath to the Probate Court as having been made for cash. On the 17th of September, 1870, the complainant executed a conveyance of his claim of one hundred and sixty acres to the defendant Godey for the sum of $500. In the bill he alleged that he did not know the contents of the instrument, but signed it at Godey's request without intending to convey any interest in the range, and that he received no consideration for it. He was not then, nor at any

other time, informed of the offer made for the **range and stock**
by Altube, of the firm of Peres & Co.

Soon after this conveyance Godey informed Altube that he
and Williams would sell him the range and stock for $13,000.
Altube accepted the offer on condition that a certain squatter
on the land should be removed. They bought off the squatter
for $500; and, on the 7th of November, 1870, Altube paid the
$13,000 for the range and stock, which sum was equally divided
between them.

In the accounts filed by the administrator, the sum bid by
the defendant, Williams, and the amount of $450 obtained
from the sale of cattle in another county, were stated as the
proceeds of the whole estate, and they were applied to various
claims, the largest of which was held by the administrator,
and to meet sundry expenditures, until a balance of only
$453.05 was left. On the 8th of July, 1872, the Probate
Court made a decree approving of the accounts and directing
that three-fourths, that is $339.78, be awarded to the com-
plainant, a receipt for which was given by Mr. Brundage, who
appears to have been an attorney, acting under an agreement
that he should receive, as his compensation, one-half of what
he should collect. No money was actually paid to the com-
plainant, but the amount was indorsed on a note of his held
by Godey.

The present bill was filed to charge the defendants as trus-
tees of the partnership property which came into their hands,
and compel them to account for the proceeds obtained by them
on its sale to Altube. Its prayer was not in form for this spe-
cific relief, but for an accounting for the value of the property
or such other relief as might be just.

The court below was of opinion that as the two Griffiths,
who composed the partnership, were both aliens and had never
taken any steps to become citizens of the United States, and as
the range was on unsurveyed public lands of the United States,
which they had never enclosed, they had in it no such property
interest as to require the administrator to include the claim in
his inventory of the property of the deceased. The court also
held that the proofs did not sustain the allegations as to the

misappropriation of the other property, or of its sale at an inadequate price. The bill was accordingly dismissed, and from that decree the case was brought by appeal to this court.

*Mr. Frank W. Hackett* for appellant.

No appearance for appellee.

MR. JUSTICE FIELD delivered the opinion of the court. He recited the facts as above stated, and continued:

It is well established that a settlement of an administrator's account, by the decree of a Probate Court, does not conclude as to property accidentally or fraudulently withheld from the account. If the property be omitted by mistake, or be subsequently discovered, a court of equity may exercise its jurisdiction in the premises, and take such action as justice to the heirs of the deceased or to the creditors of the estate may require, even if the Probate Court might, in such case, open its decree and administer upon the omitted property. And a fraudulent concealment of property, or a fraudulent disposition of it, is a general and always existing ground for the interposition of equity. Here, all the property of which the defendant Godey, as administrator of the deceased, took possession belonged to the partnership of which the complainant was the surviving partner. The portion coming to the deceased was merely the one undivided half after payment of the debts of the partnership. Only upon such portion could the court properly authorize administration. The administrator, however, interpreted the consent of the complainant that he might settle the estate of the deceased, as authority to take the whole partnership property under his control, equally as if it were the separate property of the deceased, though the consent expressly reserves the rights of the complainant as surviving partner.

The complainant, it appears, was a man of weak intellect, without any knowledge of business, and hardly able to read and write; and it is evident that he was ignorant of the nature and extent of his rights over the partnership property after the death of his brother, who had had the principal management

of it. Under such circumstances, the administrator was bound to the utmost good faith in his dealings with the property, and should be held, in its disposition, to the responsibilities of a trustee of the complainant, though we leave the proceedings of the Probate Court undisturbed.

The cattle range, which constituted the property of greatest value belonging to the partnership, was not taken possession of by the administrator, though by the law of California, then in force, all property of an intestate, real or personal, went into the hands of that officer, for purposes of administration. *Curtis* v. *Sutter*, 15 Cal. 259, 264. He plainly had a design to secure the range to himself at a trifling cost, knowing that a large price was offered for it, and could at any time be obtained. The whole administration seems to have been conducted by him to carry out this design. He first takes steps to have the cattle and horses of the partnership sold as perishable property, upon the representation that they were likely to decrease in value, become worse by keeping, and were subject to loss and expense, and, therefore, that their sale would be best for the estate; yet he well knew that a sale of the cattle, separate from the range, would be much less advantageous than with it, and the falsehood of the alleged necessity appears from the fact that the range was amply sufficient for the support of the cattle, and that they were never removed from it. He next persuades the complainant to declare his intention to become a citizen, and to file a claim to one hundred and sixty acres of the range, enclosing the springs, and then obtains a deed from him for the trifling consideration of $500. The complainant alleges that he never knew the contents of the instrument he signed, and never received the consideration named. But, assuming that he is mistaken in this particular, he was not informed of the value of the range; nothing was said to him of the price offered for it, and which Godey knew was ready to be again offered.

No sooner was this conveyance obtained than Godey opened communication with Altube, offering to sell the range and stock for $13,000. The offer was accepted on a condition which was complied with by an expenditure of $500. A sale was then

effected, and the $13,000 paid to the defendants, and, as if to show that the transaction was the result of a conspiracy, the proceeds were equally divided between them. It was a case of deception and fraud practised upon a man of weak intellect, and the rule which is stated in *Allore* v. *Jewett*, 94 U. S. 506, 511, to be settled law is applicable : " That, whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside." The complainant does not ask to have the conveyance to Godey set aside, but he asks that Godey may be compelled to account to him for the amount received for the property, of which he had thus fraudulently obtained a conveyance.

It is plain, also, that the defendant Williams participated in the fraudulent design. He never paid anything on his bid for the horses and cattle at the probate sale until weeks afterwards, and then less than one-fourth of the amount; it was not until after the cattle and horses were purchased by Altube that he paid the balance, although he knew that the probate sale could be made only for cash, and that the amount bid by him had been reported to the court as cash paid. He knew, also, that the property did not belong to the deceased, but to the partnership between him and the complainant, and that the latter had not relinquished his partnership rights. He therefore took the property with notice of those rights and of the relation as trustee which the administrator bore to the complainant. The record shows that all the partnership property was sold within six months after the death of the deceased, so as to net over $12,000, and that out of that sum the complainant received only $500. The defendants made a large profit out of the transactions, which they divided between them. They should, therefore, be required to account to the complainant, as surviving partner of the deceased, for their unjust gains. In such accounting they should be charged with the amount received

by them from the sale to Altube, and be credited with the amount paid by defendant Williams for the property purchased at the probate sale, the sum of $500 paid by defendant Godey for the conveyance of the possessory claim, and the $500 paid to remove the squatter from the land, the balance to draw interest until decree.

The error of the court below arose from treating the possessory right to the cattle range on the public lands—as it was then held by the partnership on the death of John Griffith—as not constituting any property of value which could be recognized as such by the courts, the claimants being both aliens who had never taken any steps to be naturalized. But the Constitution of California then in force invested foreigners, who were *bona fide* residents of the State, with the same rights, in respect to the possession and enjoyment of property, as native born citizens. Art. I. § 17. And the possessory right to the range, though held by aliens, was respected by their neighbors and all cattle dealers of the country, and had a market value; as shown by the price which others were ready to pay for it.

The responsibility of trustees does not depend upon the validity of the title of the grantor of the trust property. If the right or interest transferred to them can be sold for a valuable consideration, it is to be treated as property; and corresponding duties devolve upon the trustees with respect to its sale as upon the sale of property, the title of which is undisputed.

*The decree of the court below is reversed, and the cause remanded with directions to enter a decree in conformity with this opinion.*